**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Petitioner-Appellant,*

v.

No. 12-7687

FREDERICK SPRINGER,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Terrence W. Boyle, District Judge.
(5:12-hc-02009-BO)

Argued: January 30, 2013

Decided: April 29, 2013

Before WILKINSON, KEENAN, and WYNN,
Circuit Judges.

---

Affirmed by published opinion. Judge Wynn wrote the majority opinion, in which Judge Keenan concurred. Judge Wilkinson wrote a dissenting opinion.

---

## COUNSEL

**ARGUED:** Benjamin M. Shultz, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Eric Joseph Brignac, OFFICE OF THE FEDERAL PUB-

LIC DEFENDER, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Stuart F. Delery, Acting Assistant Attorney General, Mark B. Stern, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Thomas G. Walker, United States Attorney, Raleigh, North Carolina, for Appellant. Thomas P. McNamara, Federal Public Defender, G. Alan DuBois, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellee.

## OPINION

WYNN, Circuit Judge:

This case involves the government's efforts to civilly commit Frederick Springer under the Adam Walsh Child Protection and Safety Act of 2006, No. 109-248, 120 Stat. 587 (the "Walsh Act"). The U.S. District Court for the Eastern District of North Carolina found Springer ineligible for civil commitment because the government failed to prove that Springer suffered from a serious mental illness under the Walsh Act and, even assuming Springer suffered from a qualifying mental illness, that Springer would have the requisite serious difficulty refraining from sexual misconduct. Because the district court did not clearly err in concluding that Springer did not have a serious mental illness, we affirm.

We further note that because we hold that the district court did not clearly err in concluding that Springer did not have a *serious mental illness*, we need not, and thus do not, address the district court's findings with regard to whether Springer lacks *volitional control*, which our good colleague in dissent relies upon to address policy implications that do not arise from our holding today. *See United States v. Hall*, 664 F.3d 456, 463 (4th Cir. 2012) (holding that if the government fails to meet its burden to demonstrate any of three statutory criteria for sexual dangerousness, an individual may not be committed under the Walsh Act).

Moreover, Springer presently remains incarcerated because the government certified him for a second time. Thus, it is without foundation that our good colleague in dissent states that "[a] bit of caution now may spare a child a painful future." *Post*, at 26. Indeed, that unsupported remark reflects no consideration of the fact that regardless of our holding today, Springer will remain incarcerated until his current prison term expires and the district court rules on the government's second effort to civilly commit him.

## I.

## A.

To civilly commit an individual under the Walsh Act, the government must establish by clear and convincing evidence that the individual: (1) previously "engaged or attempted to engage in sexually violent conduct or child molestation" (the "prior conduct" prong); (2) currently "suffers from a serious mental illness, abnormality, or disorder" (the "serious mental illness" prong); and (3) "as a result of" that mental condition, the individual "would have serious difficulty in refraining from sexually violent conduct or child molestation if released" (the "volitional control" prong). 18 U.S.C. § 4247(a)(5)-(6); *Hall*, 664 F.3d at 461. If the government fails to meet its burden on any of the three prongs, an individual may not be committed. *Hall*, 664 F.3d at 463.

Clear and convincing evidence is evidence "of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established, and, as well, as evidence that proves the facts at issue to be highly probable." *Jimenez v. DaimlerChrysler Corp.*, 269 F.3d 439, 450 (4th Cir. 2001) (citations omitted).

## B.

Springer, who is thirty-four years old, was convicted of six separate sex offenses between 1997 and 2004. Four of the six

offenses involved victims thirteen years old and younger, with the remaining two offenses involving a sixteen year old and a nineteen year old. The most recent offense involving a victim under the age of thirteen occurred in 2000, when Springer was twenty-two. Springer also has been convicted of a number of non-sex-related offenses, including passing bad checks and larceny. In 2010, Springer was sentenced to thirty-seven months in prison, followed by lifetime supervised release, for failing to comply with the federal Sex Offender Registration and Notification Act (the "Registration Act"), 18 U.S.C. § 2250, when he moved from New York to North Carolina.

On January 9, 2012, a little less than six months before Springer's scheduled release, the government certified Springer as "sexually dangerous" and sought to have him civilly committed under the Walsh Act. In August 2012, the district court held an evidentiary hearing to determine whether Springer satisfied the Walsh Act commitment criteria. Because the parties agreed that Springer's previous sexual offenses satisfied the prior conduct prong, the evidentiary hearing focused on the final two prongs. At the hearing, both the government's expert, Dr. Graney, and the court-appointed expert, Dr. Hastings, opined that, based on Springer's prior sex offenses involving victims under the age of thirteen, he suffered from pedophilia. Dr. Graney and Dr. Hastings also opined that Springer would have serious difficulty controlling his pedophilic sexual impulses if released.

By contrast, Springer's expert, Dr. Plaud, opined that there was insufficient evidence to diagnose Springer with pedophilia. Rather, Dr. Plaud characterized Springer's previous pedophilic conduct as resulting from delayed sexual maturation caused by physical and sexual abuse during childhood, and contended that it did not reflect continuing sexual attraction to prepubescent children. Dr. Plaud further testified that he does not think Springer "has serious difficulty, as a 34-year-old man, in controlling his sexual impulses today." J.A. 187.

On September 10, 2012, the district court issued its Findings of Fact and Conclusions of Law. *United States v. Springer*, No. 5:12-HC-2009-BO, 2012 WL 3957857 (E.D. N.C. Sept. 10, 2012). The court, finding Dr. Plaud's testimony more persuasive, determined that the government failed to meet its burden on both the serious mental illness and volitional control prongs. *Id.* at *2-6. The government appealed. Springer was released from prison in October 2012 after this Court denied the government's request to stay his release pending its appeal.

## II.

Before addressing the merits of the government's appeal, it is first necessary to determine whether certain developments that occurred after the district court issued its decision preclude us from deciding this matter at the present time. On December 12, 2012, the U.S. District Court for the Northern District of New York found that Springer violated the conditions of his supervised release on the Registration Act conviction by failing to spend at least five evenings at his group residence, despite being instructed to do so by his probation officer, and engaging in a consensual intimate relationship with another adult, who also is a convicted sex offender. Based on these violations, the district court revoked Springer's supervised release and sentenced him to thirteen months imprisonment. On February 22, 2013, the Bureau of Prisons again certified Springer as meeting the criteria for civil commitment under the Walsh Act.

As a result of these recent developments, we first consider whether the present case is moot because, regardless of our disposition of the case, Springer will remain in the custody of the Bureau of Prisons until a district court rules on the government's second civil commitment attempt. Additionally, we address the government's alternative contention that we should remand the case to the district court for reconsideration in light of the new evidence regarding Springer's super-

vised release violations. In considering these two questions, we also must determine what preclusive effect, if any, decisions in these proceedings will have in Springer's second civil commitment proceeding.

## A.

The mootness doctrine is a limitation on federal judicial power grounded in the "case-or-controversy" requirement of Article III of the U.S. Constitution. "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). Because the "case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate . . . it is not enough that a dispute was very much alive when suit was filed," the parties must retain a concrete interest in the outcome of the litigation throughout all stages of the proceedings. *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990).

The mootness doctrine, however, constitutes a relatively weak constraint on federal judicial power: "A case becomes moot *only* when it is impossible for a court to grant *any* effectual relief whatever to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 132 S. Ct. 2277, 2287 (2012) (internal quotation omitted) (emphasis added); *see also Ellis v. Ry. Clerks*, 466 U.S. 435, 442 (1984) ("[A]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot."). Mootness is a jurisdictional question and thus may be raised *sua sponte* by a federal court at any stage of proceedings. *North Carolina v. Rice*, 404 U.S. 244, 246 (1971).

With this background in mind, we now consider whether the present case is moot as a result of either (1) Springer's reincarceration for violating the terms of his supervised release for the Registration Act conviction or (2) the Bureau

of Prison's second certification of Springer as sexually dangerous during the pendency of this appeal.

Despite Springer's reincarceration for violating the terms of his supervised release, both parties retained a "concrete interest" in the outcome of the proceedings after Springer was reincarcerated. Had we affirmed the district court's decision prior to the government's second certification, Springer would have been released at the conclusion of his thirteen-month sentence for violating the terms of his supervised release. By contrast, had we reversed, Springer would have been subject to indefinite civil commitment at the conclusion of his current prison term. Thus, Springer's reincarceration did not preclude us from providing "effectual relief" in the present proceedings.

The more difficult question is whether the government's second certification of Springer mooted the present proceedings. At the outset, we note that we are entering somewhat uncharted territory: The Walsh Act neither explicitly permits nor precludes the government from seeking to civilly commit an individual as sexually dangerous after the government unsuccessfully attempted to do so previously. And federal courts have not had occasion to consider a renewed certification of a sex offender under the Walsh Act, let alone whether a renewed certification during the pendency of the government's appeal of a previous adverse commitment decision moots the case under appeal.

Even assuming, without deciding, that Springer's second certification rendered this appeal otherwise moot, we are still entitled to reach the merits of the government's appeal because the present case falls within the well-established exception to the mootness doctrine for wrongs "capable of repetition, yet evading review." This exception applies when "(1) the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party

[will] be subject to the same action again." *Spencer v. Kemna*, 523 U.S. 1, 17 (1998) (quotation omitted); *Baltimore Sun Co. v. Goetz*, 886 F.2d 60, 63 (4th Cir. 1989). Although federal courts have not addressed mootness in cases involving successive efforts to civilly commit individuals under the Walsh Act, they have applied the "capable repetition, yet evading review" exception to conclude that a change in an individual's confinement status does not moot the individual's challenge to his prior civil commitment under state and federal statutes. *See, e.g.*, *Hubbart v. Knapp*, 379 F.3d 773, 777 (9th Cir. 2004); *In re Ballay*, 482 F.2d 648, 651 (D.C. Cir. 1973).

Applying the test for the exception here, we conclude that the first prong is satisfied because when the government attempts to civilly commit an individual under the Walsh Act while simultaneously appealing a prior unsuccessful attempt to civilly commit the same individual, the individual necessarily is deprived of the opportunity to fully litigate the proceedings related to the initial commitment attempt. The second prong is also satisfied because the government's second certification of an individual, close on the heels of its initial certification, indicates that the government is likely to continue to pursue civil commitment of that individual. *See Hubbart*, 379 F.3d at 777-78 ("Hubbart's claims satisfy the second 'capable of repetition' component of this analysis because he has already been subject to a second [state sex offender civil] commitment proceeding . . . ."). Thus, an attempt by the government to civilly commit a sex offender under the Walsh Act during the pendency of the government's appeal of a previous unsuccessful attempt to civilly commit the same individual does not, as a matter of law, render the earlier proceeding moot.

We further note that the dissent's recommended outcome—holding that the present case is moot *and* vacating the district court's judgment—is contrary to established precedent regarding vacatur in cases that are mooted on appeal and raises significant due process concerns. Typically, when a

civil case is mooted on appeal, the appellate court will vacate the lower court's decision and remand the case for dismissal. *See Alvarez v. Smith*, 130 S. Ct. 576, 581 (2009). "[V]acatur normally is not appropriate, however, when the losing party's deliberate actions have rendered moot an otherwise live controversy." *Remus Joint Venture v. McAnally*, 116 F.3d 180, 185 (6th Cir. 1997); *see also U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 24 (1994); *Diffenderfer v. Gomez-Colon*, 587 F.3d 445, 451 (1st Cir. 2009); *Valero Terrestrial Corp. v. Paige*, 211 F.3d 112, 117-18 (4th Cir. 2000). The rationale for this rule is that appellants should not be allowed to escape the preclusive effect of an adverse district court judgment simply by taking a unilateral action during the pendency of their appeal to moot the matter. *McAnally*, 116 F.3d at 185-86; *Wisconsin v. Baker*, 698 F.2d 1323, 1331 (7th Cir. 1983).

When the voluntary action of a losing party moots a case, "vacatur is appropriate only when it would serve the public interest." *Diffenderfer*, 587 F.3d at 451; *see also Paige*, 211 F.3d at 118. In particular, "[a] party who seeks review of the merits of an adverse ruling, but is frustrated by the vagaries of circumstance, ought not in fairness be forced to acquiesce in the judgment." *U.S. Bancorp*, 513 U.S. at 25. This exception typically applies when forces outside of the control of the appellant, such as the natural aging process, render the appeal moot. *Camreta v. Greene*, 131 S. Ct. 2020, 2034-36 (2011); *Mellen v. Bunting*, 327 F.3d 355, 364-65 (4th Cir. 2003). We also have applied this exception in cases in which our resolution of one issue ruled on by the district court effectively mooted other issues addressed by the district court. *See, e.g.*, *Taylor v. Kellogg Brown & Root Servs., Inc.*, 658 F.3d 402, 412 (4th Cir. 2011); *Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 161 (4th Cir. 2010).

Among other reasons, vacatur is not warranted here because Springer's supervised release violations, although troubling, do not cast any additional light on whether Springer

currently suffers, or has ever suffered, from a qualifying mental illness, a necessary element for commitment under the Walsh Act and the basis for the district court's decision to deny commitment. *See infra* Part II.B. Thus, Springer's post-release conduct did not inexorably compel the government to certify Springer as sexually dangerous for a second time. Indeed, the Walsh Act does not require that the government seek to civilly commit any individual.

Moreover, were we to adopt a general rule of vacatur in Walsh Act cases involving multiple certifications, the government could strategically file successive certifications until it finds a court amenable to commitment, without facing any preclusive effect from a previous court's denial of commitment. But vacatur should not be used to allow the government to hold an individual while it shops for a court more amenable to committing him under the Walsh Act. *See* Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, 13C *Federal Practice & Procedure* § 3533.10.1 (3d ed. 2008) (stating that vacatur should be denied when "the loser is acting strategically for the purpose of winning a chance to relitigate in a more favorable forum"). Consequently, even if mootness precluded us from reaching the merits, it would still be inappropriate for us to vacate the district court's decision.

More significantly, were we to agree with the dissent's recommended outcome, we would be infringing on Springer's right to due process. We have held that because of the significant liberty interests at stake, civil commitment proceedings under the Walsh Act implicate the Due Process Clause. *United States v. Timms*, 664 F.3d 436, 450 (4th Cir. 2012). It is well-established that the Fifth Amendment requires that when the government confines an individual, be it civilly or criminally, the individual is entitled to a timely, final determination of the validity of his confinement. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *Timms*, 664 F.3d at 450-55.

The Walsh Act does not specifically provide for how soon after certification an individual must be given the opportunity to fully challenge his confinement. However, the Supreme Court has held that individuals confined under other federal civil commitment statutes "can be held only for a 'reasonable period of time'" before being given the opportunity to fully litigate their commitment. *Jackson v. Indiana*, 406 U.S. 715, 733 (1972). We previously have indicated—and now hold—that an individual cannot be certified indefinitely for civil commitment under the Walsh Act, without any final judicial determination regarding the validity of his confinement. *See United States v. Broncheau*, 645 F.3d 676, 687 n.10 (4th Cir. 2011); *id.* at 687-88 (Wynn, J., concurring).

Under the dissent's approach, the government could appeal an unsuccessful attempt to civilly commit an individual under the Walsh Act and, during the pendency of that appeal, again certify the individual as sexually dangerous to moot the case and have the district court's decision denying civil commitment vacated. Consequently, the district court's initial decision would lack preclusive effect in the second commitment proceeding, making it easier for the government to prevail. Notably, because the Walsh Act does not address successive certifications, there is no statutory limitation on the number of times the government may certify an individual or requirement that successive commitment efforts rely on new or different facts or legal theories.[1] Thus, if the district court rejected the government's second attempt to commit the individual, the government could appeal and, during that appeal, file another certification of the individual, once again restarting the commitment process without any preclusive decision on the books. All the while, the individual would be confined.

---

[1]The only statutory precondition for certification is that the person be in the custody of the Bureau of Prisons, be civilly committed as mentally incompetent to stand trial under 18 U.S.C. § 4241(d), or have had all criminal charges against him "dismissed solely for reasons relating to [his] mental condition." 18 U.S.C. § 4248(a).

*See* 18 U.S.C. 4248(a) ("A certificate filed under this subsection shall stay the release of the person pending completion of procedures contained in this section.").

Consequently, the dissent's approach could potentially allow the government to effectively indefinitely hold an individual without providing him with a timely and meaningful opportunity to fully litigate his confinement simply by repeatedly certifying the individual while it appeals adverse district court rulings. Moreover, the dissent's approach would allow the government to detain an individual until it is successful in one of its repeated attempts to convince a district court that an individual should be civilly committed. Such a result plainly contravenes the Due Process demands of the Fifth Amendment, which require that an individual be able to fully and fairly litigate the validity of his detention within a "reasonable time."[2] *Jackson*, 406 U.S. at 733.

The preclusive effect of the district court's judgment, affirmed on appeal, prevents the government from attempting to commit Springer based on nothing more than the same evidence originally found inadequate by the district court. When the government presents additional evidence in the second certification proceeding, the district court will be in a position to consider that new evidence and the impact that it has on the

---

[2]Springer's situation is illustrative. The government first certified him as sexually dangerous on January 9, 2012, and certified him for a second time on February 22, 2013. Given that it took us more than fifteen months to issue an opinion on the government's first attempt to civilly commit Springer, were we to follow the dissent's approach, he would not receive a final determination regarding his civil commitment until June 2014, nearly two-and-a-half years after he was initially certified and confined as sexually dangerous. And that assumes the government does not certify Springer for a third time, were the district court again to refuse to commit him. Although not a question that is at issue in this appeal, whether an individual's commitment status can remain in limbo for such a lengthy period of time without running afoul of the Due Process Clause remains an open question. *See Broncheau*, 645 F.3d at 687 n.10; *id.* at 687-88 (Wynn, J., concurring)

issue of whether Springer presently suffers from a serious mental illness, abnormality, or disorder, within the meaning of 18 U.S.C. § 4247(a)(5)-(6).

Affirmance of the district court's judgment, rather than adopting the novel procedural suggestions of our dissenting colleague, also is faithful to the intent of the Walsh Act, which is to protect society from sexually dangerous individuals consistent with their constitutional liberties. In contrast, avoidance of entering a final judgment in this appeal suggests a result-oriented reluctance to afford this individual the routine, yet essential, protections afforded by our system of appellate review.

### B.

Having determined that this matter is not moot, we now turn to whether we should remand the case to the district court for reconsideration in light of these recent developments. Federal courts have not had occasion to address when, if at all, new evidence warrants remand in civil commitment actions under the Walsh Act. Generally, we only order remand for consideration of new evidence at a party's request and when there is a basis for doing so in a rule or statute. *See, e.g.*, 28 U.S.C. § 2347(c) (authorizing federal courts of appeal to remand an appeal of an agency decision for reconsideration in light of additional evidence at the request of a party to the appeal); 42 U.S.C. § 405(g) (authorizing federal courts to remand a social security benefits determination to the Social Security Administration for consideration of new evidence on motion of the Commissioner of Social Security). Although the government has requested remand, the Walsh Act includes no provisions addressing if and when remand for reconsideration of new evidence is appropriate.

We further note that, in other contexts, we order remand only when new evidence would have been "material to" or given "considerable weight" in the district court's initial

determination. *See, e.g.*, *United States v. Chavis*, 880 F.2d 788, 793 (1989); *Harvey v. Heckler*, 814 F.2d 162, 165 (4th Cir. 1987); *O & Y Nuri v. The Johanna*, 210 F.2d 261, 261 (4th Cir. 1954).

Here, we hold that the district court did not err in finding that Springer has never suffered from pedophilia. *See infra* Part III.B. The new evidence proffered by the government shows that Springer violated the conditions of his supervised release by spending nights away from his group residence and associating with a convicted sex offender. The government argues that this new evidence is relevant to the serious mental illness prong because it undermines Springer's credibility, which it maintains the district court relied upon in determining Springer does not suffer from pedophilia. But the government has not identified any cases where we have held that remand is warranted when new evidence of a witness's credibility comes to light after a district court issues its decision. And although it is troubling when any offender violates the terms of his supervised release, neither of these violations are material to-or even speak to-the issue of whether Springer currently suffers, or has ever suffered, from pedophilia.

Our good colleague in dissent utters a failure to "understand the rush to send an unnecessary signal that the release of a serial child sex offender was appropriate." *Post*, at 19. The rationale for our holding is simple: Exercise judicial restraint and address the issues in this case rather than hypothetical policy concerns that are not at issue in this case. Indeed, the dissent contends that Springer's supervised release violations are material to the district court's decision because they "suggest[ ] that he still cannot fully control his impulsive behavior or obey legal authority." *Post*, at 22. But that contention is not at issue here because it only deals with the volitional control prong, not the serious mental illness prong, which is the basis of our conclusion that the district court's decision must be affirmed. *Hall*, 664 F.3d at 463.

The dissent also intimates that by reaching the merits of the government's appeal our holding increases the risk that Springer will sexually assault a child in the future. That too is not at issue in this case because, as the dissent concedes, regardless of the outcome of this case, "Springer will remain incarcerated until his current prison term expires, and the government will have to prove anew at Springer's next commitment hearing that he meets the requirements for civil commitment under the Adam Walsh Act." *Post*, at 20-21. Thus, neither our good colleague in dissent nor anyone else need "fear that some young child somewhere will experience" what the dissent characterizes as "the consequences of a poor predictive judgment on our part." *Post*, at 19. Without addressing the propriety of a court engaging in making a "predictive judgment," suffice it to say that in this case, Springer is currently incarcerated and will remain incarcerated unless the district court determines, with the benefit of evidence concerning his supervised release violations, that Springer is not eligible for commitment.

## III.

### A.

Having determined that this matter is ripe for review, we turn to the merits of the government's appeal. In cases in which the government seeks civil commitment of a convicted sex offender under the Walsh Act, this Court reviews the district court's factual findings for clear error and legal conclusions de novo. *United States v. Wooden*, 693 F.3d 440, 451 (4th Cir. 2012). Under the clear error standard, "'[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, [we] may not reverse it even though convinced that had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently.'" *Id.* (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573-74 (1985)). When the district court's findings "are based on determinations regarding the credibility of witnesses, we give

even greater deference to the trial court's findings." *Hall*, 664 F.3d at 462 (internal quotation omitted).

Nevertheless, "while clear-error review is deferential, it is not toothless" and therefore we may set aside a district court's factual findings if the court failed to "properly tak[e] into account substantial evidence to the contrary" or its "factual findings are against the clear weight of the evidence considered as a whole." *Wooden*, 693 F.3d at 451, 462 (quotations omitted). Even so, we may find a district court's factual findings were clearly erroneous only if we are "left [ ] with the definite and firm conviction that a mistake has been committed." *Id.* at 451 (quotation omitted).

B.

On appeal, the government argues that the district court clearly erred in finding that there was not clear and convincing evidence that Springer suffers from a qualifying mental illness. In particular, the government argues that the district court's decision (1) was contrary to the diagnostic criteria for pedophilia set out in the Diagnostic and Statistical Manual of Mental Disorders ("DSM"); (2) incorrectly concluded that Springer no longer suffers from pedophilia; (3) improperly credited Springer's testimony that he is no longer attracted to prepubescent children; and (4) improperly relied on Dr. Plaud's opinion because Dr. Plaud failed to consider pertinent conflicting evidence. We disagree.

According to the DSM, an individual suffers from pedophilia if, "[o]ver a period of at least 6 months," he experiences "recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children (generally age 13 years and younger)." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders § 302.2, at 572 (4th ed., Text Revision 2000). Pedophilia is a "serious mental illness" for purposes of the Walsh Act. *Hall*, 664 F.3d at 463.

The government contends that the district court erred in finding that Springer does not suffer from pedophilia because the evidence at trial showed Springer engaged in sexual acts with a prepubescent boy over a nine-month period in 1996 and 1997, which meets the DSM definition. But the Supreme Court has said that courts are not bound by medical definitions in determining whether an individual suffers from a mental illness as a matter of law because "psychiatry . . . informs but does not control ultimate legal determinations." *Kansas v. Crane*, 534 U.S. 407, 413 (2002); *see also Kansas v. Hendricks*, 521 U.S. 346, 359 (1997) ("Legal definitions . . . must take into account such issues as individual responsibility . . . and competency, [and consequently] need not mirror those advanced by the medical profession." (quotation omitted)); *United States v. Caporale*, 701 F.3d 128, 136 (4th Cir. 2012) (noting that "one will search § 4247(a)(6) in vain for any language purporting to confine the universe of qualifying mental impairments within clinical or pedagogical parameters" and, consequently, that "it has been left to the courts to develop the meaning of 'serious mental illness, abnormality, or disorder' as a legal term of art"). Therefore, it was within the district court's discretion not to follow the DSM in determining whether Springer suffers from a serious mental illness under the Walsh Act.[3]

Next, the government argues that the district court incorrectly concluded that Springer had "outgrown" his earlier pedophilia when it acknowledged, as Dr. Graney and Dr. Hastings testified, that pedophilia is a life-long condition. Appellant's Br. at 14-16. But the government's argument is premised on the district court having found Springer previously suffered from pedophilia and later grew out of it, which

---

[3]The government also suggests that the district court's decision that Springer does not suffer from pedophilia was clearly erroneous because Springer testified that he believes he used to suffer from pedophilia. But the government offers no support, nor can we find any, for the government's position that the district court must credit Springer's self-diagnosis.

the district court did not. Rather, the district court credited Dr. Plaud's diagnosis that Springer never suffered from pedophilia. *Springer*, 2012 WL 3957857, at *2 ("Although both of the government's experts diagnosed Mr. Springer with pedophilia, the Court credits the testimony of Dr. Plaud . . . that there is insufficient evidence to support a diagnosis of pedophilia . . . ."). And the district court noted that pedophilia tends to be a life-long condition only to emphasize that the lack of evidence of any offenses against prepubescent children since 2000 casts doubts on Dr. Graney's and Dr. Hastings' diagnoses that Springer suffers from pedophilia. *Id.*

Third, the government contends that the district court improperly credited Springer's testimony that he is no longer sexually attracted to prepubescent children because Springer has a history of lying and his "self-assessments . . . are colored by mental illness." Appellant's Br. at 16. We give great deference, however, to a district court's determinations regarding the credibility of a witness, *Hall*, 664 F.3d 462, and find no precedent for the government's position that the district court must acknowledge a witness's history of lying in its opinion. Further, we note that the district court reasonably found that the credibility of Springer's testimony was bolstered by the fact that the government produced no evidence that Springer has engaged in inappropriate sexual conduct with a prepubescent minor since 2000. *Springer*, 2012 WL 3957857, at *2-3.

Finally, the government maintains that the district court improperly credited Dr. Plaud's determination that Springer does not suffer from pedophilia because Dr. Plaud failed to consider certain conflicting pieces of evidence. Most significantly, the government says Dr. Plaud failed to account for Springer's nine-month abuse of a seven year old in 1996 and 1997. Although the failure to consider substantial conflicting evidence can constitute clear error, *Wooden*, 693 F.3d at 451-52, here the record shows that Dr. Plaud did consider Springer's molestation of the seven year old in rendering his opin-

ion. In particular, Dr. Plaud said that Springer's abuse of the seven year old when Springer was in his late teens fit into his diagnosis that Springer suffered from delayed sexual maturation due to physical and sexual abuse during his childhood.

### IV.

In sum, the district court did not clearly err in finding that Springer currently does not suffer from a qualifying mental illness.[4] Consequently, we affirm.

*AFFIRMED*

WILKINSON, Circuit Judge, dissenting:

I appreciate the conscientious attention that my good colleagues have devoted to this case, but I do not understand the rush to send an unnecessary signal that the release of a serial child sex offender here was appropriate. Given the hurdles the majority must clear to reach the finish line of an affirmance, the district court would be well within its rights to conclude that the case is now for all intents and purposes over, and that the latest evidence of Springer's condition and impaired volitional control is all but irrelevant. Though we may never learn the consequences of a poor predictive judgment on our part, I fear that some young child somewhere will experience them. The matter was on the edge before the latest evidence, and we should at least ask the trial court to take a fresh and careful look at what my friends in the majority must recognize is a very troubling case.

I do appreciate the personal liberty interests at stake here, and I do understand the view my colleagues take, namely that

---

[4]As stated earlier, because we hold that the district court did not clearly err in concluding that Springer did not have a serious mental illness, we need not, and thus do not, address the district court's findings with regard to the volitional control prong. *Hall*, 664 F.3d at 463.

the district court is better positioned than are we to evaluate the conflicting testimony in Springer's case. But that is precisely my point. The district court has not been able to review important evidence in this case. During the pendency of this appeal, it was brought to our attention that Springer violated the terms of his supervised release in two distinct ways within a scant two months after leaving prison. First, Springer violated the condition that he sleep at his group residence every evening. On at least five separate occasions in late 2012, he failed to report to the residence as required. Second, Springer violated the condition that he not associate with any person convicted of a felony. In December 2012, he began an intimate relationship with another convicted sex offender. As a result of this misconduct, Springer was reincarcerated, and the government has formally recertified him as meeting the criteria for civil commitment under the Adam Walsh Act, Pub. L. 109-248, 120 Stat. 587 (2006), following his expected release in November 2013. *See* 18 U.S.C. § 4248. The district court had no opportunity even to consider Springer's most recent violations, and its decision on appeal here has been rendered moot by the government's second certification.

I.

"A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Already, LLC. v. Nike, Inc.*, 133 S. Ct. 721, 726-27 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curiam)). Because Springer was reincarcerated in December 2012, no live controversy remains between him and the government with respect to the underlying question now before us: whether he should have been subject to civil commitment following his release from prison in October 2012. The foundation of this case has slipped out from under us. Regardless of any disposition we might issue on the merits here, Springer will remain incarcerated until his current term of imprisonment expires, and the

government will have to prove anew at Springer's next commitment hearing that he meets the requirements for civil commitment under the Adam Walsh Act.

By ruling on the merits of this appeal, we are in dereliction of our duty "to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before [us]." *Oil Workers v. Missouri*, 361 U.S. 363, 367 (1960). Therefore, I would dismiss this appeal as moot and vacate the judgment of the district court, *see United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950), leaving for another day the question of whether Springer should be committed following his actual release.*

## II.

Even if this case were somehow not mooted, I would at least remand it and afford the district court an opportunity to revisit its decision near the close of Springer's most recent reincarceration resulting from his most recent misconduct. Springer's latest violations are material to the district court's determination as to his future dangerousness. A central premise of the trial court's ruling was that Springer is not likely to reoffend because he credibly testified that "he has matured," "he knows his actions were wrong," and he "knows . . . that he needs help." J.A. 464-65. The court also noted that "upon his release from custody, Mr. Springer will have a system of checks in place [through supervised release] that may reinforce his own ability to control his sexual impulses." J.A. 466.

---

*Though the government's recertification of Springer was one of the developments that led to the mooting of this case, vacatur is still justified because the government did not procure mootness through its own "unilateral action." *U.S. Bancorp Mtg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 23, 25 (1994). Rather, mootness arose when, "by the vagaries of circumstance," *id.* at 25, the government was moved to take action in response to Springer's violations.

In short, the trial court concluded that Springer had left behind whatever impulsive and pedophilic tendencies from which he may have suffered.

The recent violations, however, draw these findings into question. Springer's failure to comply with the conditions of supervised release—on at least five separate occasions within the first two months of his release—suggests that he still cannot fully control his impulsive behavior or obey legal authority. The condition that Springer sleep at his group residence is important because it limits his ability in the evening to develop the kind of false trust in a minor that often accompanies child sexual abuse. And the fact that he also violated the condition that he not fraternize with another convicted sex offender calls into greater question the conclusion that he has outgrown his prior sexual tendencies. In short, Springer was told what not to do, and he did it. To be blunt, this does not bode well.

Considering Springer's lengthy list of convictions for sexual offenses, this is a case that was close even without the latest evidence. (In describing his offenses, I have omitted the more graphic details.)

In 1997, Springer was convicted of sexually abusing the eleven-year old sister of his then-girlfriend. *See* J.A. 88 (noting that Springer liked the victim "because she was flat-chested; she wasn't developed").

That same year, he also pled guilty to third-degree sexual abuse against a thirteen-year old boy . *See* J.A. 89, 322 (noting that Springer performed oral sex on the victim at least three times and, on one occasion, "grabbed" the victim, "held him down," "groped his testicles," and "kissed him").

In November 2000, following his prison term for the 1997 offenses, Springer committed third-degree sexual abuse by

grabbing and molesting a nineteen-year old while she was sleeping. J.A. 231, 240. He pled guilty to that offense. *Id.*

Several months later, he was convicted of acting in a manner injurious to a child after he offered a thirteen-year old boy money in exchange for an opportunity to photograph the boy naked. *See* J.A. 86-87 (noting that the victim was the younger brother of someone Springer was dating).

In 2002, Springer was convicted of second-degree sodomy against a seven-year old child. J.A. 242-43. That conduct took place in 1996 and 1997. *See ante* at 17 (noting that "Springer engaged in sexual acts with a prepubescent boy over a nine-month period"); *see also* J.A. 84-85 (indicating that Springer forcibly performed oral sex on the victim multiple times while serving as his babysitter).

Finally, in 2004, he pled guilty to sexual misconduct for engaging in nonconsensual oral and anal sex with a sixteen-year old. J.A. 82-83, 231.

Springer has also been convicted of several other non-sexual offenses, including check fraud, larceny, and failure to comply with sex-offender registration laws. J.A. 230-31.

Since the time of his convictions, Springer has spent about four years in the community without committing a sexual offense. Despite that seeming progress, however, he "once said in a mental health session [in 2004] that he would not abuse children again unless they really, really wanted him to." J.A. 136. During the commitment proceedings below, Springer admitted it was "difficult" for him to "refrain[ ] from having contact with young children during the time [he was] out on release." J.A. 116. When asked if he thought he was "sexually dangerous," he admitted: "If I don't do treatment and I get off my medicine and really start doing drugs, I would probably be sexually dangerous." J.A. 93-94.

As the district courts in North Carolina and New York have both recognized, the terms of supervised release existed to lessen the chance that this latter scenario would unfold. The North Carolina district court specifically made reference to the importance of those conditions, *see* J.A. 466, and the New York district court found the conditions here sufficiently significant to impose a thirteen-month reincarceration for their violation, *see* J.A. 224-25. Surprisingly, and by contrast, the majority appears to downplay the importance of the supervised release infractions, arguing that the violations, "although troubling, do not cast any additional light on whether Springer currently suffers, or has ever suffered, from a qualifying mental illness." *Ante* at 9-10.

I respectfully suggest, however, that those violations are highly pertinent to the central question before us, namely whether Springer will revert to his earlier pattern of child sexual abuse. The majority's insistence that it affirms only a chunk of this case (that dealing with the serious mental illness prong) overlooks the fact that mental illness does not exist in a vacuum separate and apart from the question of volitional control. By Springer's own admission, the combination of doing drugs and being off his medication would likely render him "sexually dangerous." J.A. 93-94. Once again, the now-violated supervised release terms were meant both to head off that possibility and to assist Springer in the gradual restoration of his personal liberty.

Were I the trial judge in this case, I may well not have ruled as the district court did. However, putting the mootness issues aside, the standard of review and the superior vantage point of the district court require me to treat the decision below with real respect. Even so, I am not willing to take the additional step of affirming and giving preclusive effect to multiple findings made wholly without the benefit of the most recent evidence. Springer's history of child sexual abuse is sufficiently troubling and this new evidence sufficiently relevant that—assuming the case were not moot—I would vacate

the district court's decision and remand with directions that the case be held in abeyance until a time that is close to Springer's actual date of release. We leave less to chance when we possess a fuller picture.

## III.

A brief response to several of the majority's points is in order. Contrary to the majority's protestation, there is no due process violation. Before committing Springer, the government will bear the burden of proving in a hearing by clear and convincing evidence that he is "sexually dangerous." 18 U.S.C. § 4248. The majority worries about forum shopping, but the only fora involved here have been the Eastern District of North Carolina, where Springer was previously confined for failure to comply with federal sex offender registration laws, and the Northern District of New York, where his supervised release violations as well as his underlying sexual abuse offenses took place. Further, contrary to the majority, this case would only be "capable of repetition" if Springer himself repeats his disregard of supervised release terms immediately upon release, and it will not "evade review" if Springer simply conforms to those terms.

Finally, this is not a case where the government is seeking a second bite at the apple. There has been no serial recertification process here, nor could there ever be absent significant new evidence of recent behavior that Springer was indeed sexually dangerous, as defined by the statute. The new evidence here all postdates the district court's release order. It could not have been brought before that court in the earlier hearing. Given that circumstance, I am unable to discern any basis in law for not allowing a recertification hearing to proceed on a clean and non-preclusive slate.

There are surely instances where the state oversteps and where the legal system malfunctions. But this case is not one of those. Indeed this court unanimously denied the govern-

ment's motion to stay the district court's order of release. *United States v. Springer*, No. 12-7687, Order of Oct. 5, 2012. The case was running Springer's way. He had it within his power to regain the fullest measure of liberty, and it will not do for the majority to conjure up parades of nonexistent horribles or to lay the blame for the unfortunate situation here at someone else's doorstep.

## IV.

In the Adam Walsh Act, Congress sought both to prevent unjustified infringements of personal freedom and to protect children against sexual molestation and abuse. Children often lack defenses against sexual predation, especially if they are lonely or despondent, without adequate parental protection, or struggling simply to make a go of life. The Act requires us to predict Springer's ability to refrain from sexually violent conduct and child molestation going forward. Given the sad and scarring consequences of a guess gone awry, I believe that any decision on the merits must be informed by consideration of the most recent and relevant evidence.

It hardly suffices to argue that the facts will all emerge in due course during the next commitment hearing. For if that is so, we should stand back now and let those facts develop free of the preclusive effect of a hasty merits ruling. The premature affirmance here puts an unwarranted thumb on the scale of any further consideration of this case and places this court's imprimatur upon the decision to release. Why the rush? A bit of caution now may spare a child a painful future.